FILED
2013 Jul-24  AM 11:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

TANISHA C. FOSTER,             )

      PLAINTIFF,          )

VS.                    )         2:12-cv-707-JHH

BIOLIFE PLASMA SERVICES, LP,  )

      DEFENDANT.        )

**MEMORANDUM OF DECISION**

The court has before it the April 10, 2013 Motion (Doc. #18) of Defendant Biolife Plasma Services, LP ("BioLife") for Summary Judgment.  Pursuant to the court's April 10, 2013, April 23, 1013 and May 22, 2013 orders (Docs. # 19, 21 & 25), the Motion (Doc. #18) for Summary Judgment was deemed submitted, without oral argument, on June 4, 2013.[1]  After careful review of the briefs and admissible evidence, the court concludes that the Motion (Doc. #18) for Summary Judgment is due to be granted for the following reasons.

**I. Procedural History**

Plaintiff Tanisha C. Foster commenced this action on February 29, 2012 by

---

[1] On June 18, 2013, the court denied Plaintiff's Motion (Doc. #30) to file a sur-reply. (See Doc. #32.)

filing a complaint in this court alleging violations of Title VII of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et. seq and 42 U.S.C. § 1981.

More specifically, Plaintiff contends that she was terminated because of her race.

Defendant's Motion (Doc. #18) for Summary judgment asserts that Plaintiff has failed

to make a prima facie case of race discrimination and, in the alternative, Plaintiff has

failed to rebut Defendant's legitimate and nondiscriminatory reasons for her

termination; therefore, Defendant argues that it is entitled to summary judgment.

Both parties have filed briefs and submitted evidence in support of their

respective positions.   Defendant submitted evidence[2] in support of its own Motion

for Summary Judgment and filed a supporting brief on April 10, 2013.   On May 24,

2013, Plaintiff filed a brief and evidence[3] in opposition to Defendant's Motion for

Summary Judgment.   On June 3, 2013, Defendant filed a reply (Doc. #29) brief in

support of its Motion for Summary Judgment.   All briefs and evidence have been

considered by the court in making its determination on the Motion (Doc. #18) for

---

[2] Defendant submitted the following evidence in support of summary judgment: deposition of Tanisha C. Foster; exhibits to Foster deposition; deposition of Erick Stevick; exhibits to Stevick deposition; declaration of Erick Stevick.

[3] Plaintiff submitted the following evidence in opposition to summary judgment: declaration of Tanisha C. Foster; declaration of Marvin King' BioLife's SOP- Sample Receiving & Inspecting; deposition of Erick Stevick; deposition of Sutton Burleigh; EEOC Notice of Charge of Discrimination; BioLife's Position Statements to EEOC; 9/22/10 ECM for Christopher Pruitt- Final Warning; 8/5/11 ECM for Christopher Pruitt - Termination; BioLife's SOP-Good Documentation Practices; ECM- Termination Notices for Foster, King and Montgomery.

Summary Judgment.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000)  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v.

City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.  The  method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party

4

satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Defendant BioLife collects high-quality plasma which is processed into plasma-based therapies to be used in the treatment of disorders such as hemophilia and immune system deficiencies, as well as victims of shock and burns.  (Stevick Decl. ¶ 3.)   BioLife operates numerous plasma collection facilities throughout the country where individuals donate plasma and laboratories where the donations are screened for viruses using polymerase chain reaction ("PCR") technology.  (Foster Dep. at 57, 62; Stevick Decl. ¶ 4.)

### A.  BioLife Standard Operating Procedures (SOPs) at Issue Here

BioLife is highly regulated by the Food and Drug Administration[5] and maintains numerous Standard Operating Procedures ("SOPs") outlining in detail how procedures must be conducted to ensure compliance with federal law.  (Foster Dep. at 53-54.)  The SOPs  contain detailed instructions regarding  how not to change documents to avoid implications of falsification.  (Id. at 58-59; Stevick Dep. at 154-55, 180.)   BioLife defines falsification was "knowingly producing documentation that is in some way untrue or meant to deceive."  (Exh. 5 to Stevick Dep.)

---

[4]    Facts are undisputed unless otherwise expressly noted.    If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

[5]   The FDA audits BioLife's documentation on a biennial basis; inaccurate documentation may lead to fines or closure of a facility.  (Stevick Dep. at 210-14, 217, 219, 226-27.)

If a procedure is not followed according to the SOPs, then a Nonconformance has occurred. (Stevick Dep. at 76.) If the Nonconformance is attributable to a collection center, and not the lab, then an external Nonconformance has occurred and requires an external Nonconformance form ("ENC form"). (Id. at 78-79, 92, 94, 118, 170, 210.) On the other hand, when an error is made inside the lab, an internal Nonconformance form must be completed. (Id. at 76.) Both nonconformance forms are BioLife's way to documenting when its SOPs are not followed. (Id.) BioLife maintains that it is important to detect and document nonconformances because if they are not detected, unviable samples may proceed to pooling and testing, which creates the possibility of inaccurate results and leads to possibly tainted plasma. (Id. at 124-26, 134-35.)

BioLife has SOPs that govern the process of receiving shipments of plasma at labs from donor center. (Stevick Dep. at 173-75; Pl. Exh. 3.) When plasma samples are delivered to the lab, they first go through the receiving department where a technician reviews the samples and accompanying Sample Shipment Information form ("SSI form") to verify that they meet BioLife's SOPs regarding sample shipments. (Stevick Dep. at 12-23, 49, 50, 55.) Under BioLife's SOPs, all plasma samples must be received at the lab the day after they were shipped. (Stevick Dep. at 174.) The technician must document when the samples are received, and are

7

specifically required to check that the shipping and receiving dates are consecutive. (Id. at 175-75.)  If the shipping and receiving dates are not consecutive, an ENC must be generated to determine the length of time the samples were in transit.[6]  (Id. at 79.)

After the samples are received and checked for consecutive dates, the samples then go in the freezer, and the SSI forms go through a quality check with the quality assurance department of the PCR lab.  (Stevick Dep. at 55-56.)  Next, the samples go to the processing department of the PCR labs where they are grouped together into bundles of 512 samples and prepared for pooling.  (Id. at 58.)  The SSI forms for the bundle of 512 samples are put into one folder[7] and brought with the samples to the pooling department where the samples will be pooled and a master sample is created that is sent for virus testing.  (Id. at 60-62.)  The folder containing the SSI forms then goes through operations review by a pooling technician.[8]  (Id. at 64-65.)  If no errors are found during the operations review, the folder is routed to the shipping area.  (Id. at 66.)  The SSI form is again reviewed by quality assurance before the master sample

---

[6]  If an employee fails to generate an ENC on an SSI form when the shipping and receiving dates are not consecutive, there is an internal Nonconformance, level II, error for failing to initiate an ENC for the nonconsecutive shipping and receiving dates.  (Burleigh Dep. at 111-12.)

[7]  The folder containing the SSI forms is not kept in a secure locations, but instead in an open area in the PCR lab where all employees have access to it.  (Burleigh Dep. at 101.)

[8]  The goal is to have everything that has been pooled that day reviewed by the end of the day or the next morning.  (Stevick Dep. at 65-66.)

is shipped off for testing. (Id. at 73.) Each employee who conducts a review must document their review and indicate whether the SSI form meets all of BioLife's SOPs. (Id. at 80-81.)

BioLife also has an SOP regarding how to correct documentation errors. (Exh. 5 to Stevick Dep.) Under this policy, it is a violation of the Good Documentation Practices ("GDP") to write over a previously written word or number. (Id.) An example given in the GDP is trying to make a 5 into a 6. (Id.) This type of error results in a Level II Nonconformance ("NCII").[9] (Stevick Dep. at 182.)

BioLife has a threshold number of NCIIs an employee can receive in a 30 day period. (Burleigh Dep. at 57.) If an employee received more than two NCIIs within 30 days, he or she received an Employee Conference Memorandum or "memo counseling." (Stevick Dep. at 205.) BioLife looks for trends in the root causes of NCIIs received by an employee over three month periods to determine what type of corrective action to issue. (Burleigh Dep. at 65-66.) At all times relevant here, BioLife had a progressive corrective action process. If there was a trend, the corrective action could progress from the memo counseling to a first notice, first

---

[9] There are different levels of internal nonconformances, depending on the severity. (Stevick Dep. at 78.) A Level I Nonconformance (NCI) is mild or harmless and has no risk to the product; a Level II Nonconformance (NCII) is moderate with a potential risk that could affect the product; and a Level III Nonconformance (NCIII) is severe and results when errors are not caught and those areas affect BioLife's product. (Id. at 128-29.) A NCIII could result in the FDA shutting down a lab. (Burleigh Dep. at 149-50.)

warning, or final warning, depending on the situation.  (Burleigh Dep. at 59-60.)

Multiple counseling memos for exceeding thresholds for internal Nonconformances

can also lead to termination.  (Id. at 72.)

## B.  BioLife's Hoover, Alabama Facility

BioLife's Hoover, Alabama facility receives shipments of plasma samples from

donor centers across the United States.  The Hoover facility processes these samples

and pools them for virus testing to ensure that they are viable for use in

manufacturing biological products.  (Stevick Dep. at 49-53.)

Erick Stevick (Asian-American) is the PCR Pooling Laboratory Manager at

BioLife's Hoover facility. (Foster Dep. at 44, 63; Stevick Dep. at 26, 28- 29.)  PCR

Pooling Laboratory Supervisor Nittaya Waller (Asian-American) and Evening Shift

PCR Laboratory Supervisor Sutton Burleigh (Caucasian), both of whom reported to

Stevick, rounded out the PCR Lab supervisory team at the Hoover facility. (Foster

Dep. at 43-44, 63; Stevick Dep. at 37, 240-41.)   Stevick is responsible for all hiring

and firing decisions at the Hoover facility.  (Stevick Dep. at 40-42, 198.)

Plaintiff Tanisha Foster applied for a PCR Lab Technician position at the

Hoover facility on March 4, 2011.  (Foster Dep. at 40-42.)  She interviewed with

Stevick, Waller and Burleigh.  (Id. at 42-43, 66, 69.)  BioLife offered Foster a PCR

Lab Technician position on the second shift, reporting to Burleigh, which she

10

accepted.  (Foster Dep. at 47, 49-51, 62-63.)  She began working on March 21, 2011

at the Hoover facility.  (Id.)  Foster's job responsibilities primarily included pooling

plasma samples and reviewing their corresponding documentation to ensure

compliance with the SOPs.  (Id. at 60-62, 76; Exh. 18 to Foster Dep.)

**C.  July 13, 2011 Nonconformance in SSI Form**

On July 7, 2013, the Hoover lab received a shipment of plasma samples from

the Fond Du Lac, Wisconsin collection center.  (Stevick Dep. at 69-70.)  The

shipment's SSI form listed the shipping date as July 2, 2011.  (Foster Dep. at 57; Exh

20 to Foster Dep.; Stevick Dep. at 70.)  Because the SSI form did not contain

consecutive shipping and receiving dates, an ENC form was required and the samples

had to be quarantined until the nonconformance was resolved.[10]  (Stevick Dep. at 70,

82-83.)  This did not happen.  Instead on July 7, 2011, Lab Technician Carmela

Montgomery (African-American) initialed receipt of the shipment, inspected the

shipment's paperwork, including the SSI form, and placed the plasma samples in the

freezer.  (Foster Dep. at 46; Stevick Dep. at 48-50, 54, 56-58, 81, 84-85, 110-12; Exh.

3 to Stevick Dep.)  Montgomery did not identify the nonconsecutive shipping and

---

[10] If the shipping date of July 2, 2011 was confirmed, the samples would be discarded as
unviable.  (Stevick Dep. at 83, 88, 122.)  However, if the collection center noted the shipping
date incorrectly, and the actual shipping date fell within the established parameters of
the SOP, the samples may be viable, but an ENC would still be required. (Id. at 83-84.)

receiving dates on the SSI form.  (Stevick Dep. at 71, 81, 185-86.)

Later that same day, Quality Assurance employee Margaret McKenna (Caucasian) performed a quality check on the SSI form to ensure compliance with the SOPs.  (Foster Dep. at 111, 130; Stevick Dep. at 55-58, 74, 84-85, 110, 112.)  Like Montgomery, McKenna did not notice the nonconsecutive shipping and receiving dates.  (Stevick Dep. at 74-75, 84-85, 185-86.)

Six days later, on July 13, 2011, the samples were removed from the freezer, thawed, decapped, and pooled into one master sample.  (Id. at 115, 186.)  After the pooling was completed, Lab Technician Nancy Vann (Caucasian) reviewed the shipment's documentation, including the SSI form, to ensure compliance with the SOPs.  Vann began her review at 2:00 p.m. on July 13, 2011.  (Id. at 117, 239.)  During her review, Vann identified that the shipping and receiving dates on the SSI form were not consecutive.   (Id. at 117, 137, 239-40, 247.)  Vann asked Quality Assurance employee Donna Aaron (Caucasian) to review the SSI form and confirm that the SOPs required an ENC form.  (Foster Dep. at 98-99, 130; Stevick Dep. at 117-18, 135, 240.)  Aaron agreed with Vann that an ENC form was required.  (Id. at 130; Stevick Dep. at 117-18, 137, 240, 342-43.)

Vann did not initiate the ENC herself, however, because she identified the nonconformance towards the end of her shift.  (Stevick Dep. at 118, 136.)  Instead,

12

she took the folder to the Lead Technician, Erica Caldwell (African American), and told her that she and Aaron had identified a nonconformance with the SSI form's receiving date. (Stevick Dep. at 118-19, 137, 143.) Caldwell placed the folder in the lab's review basket between 3:00 and 4:00 p.m. and asked Montgomery to complete the reviews in the basket before her shift ended. (Stevick Dep. at 118-20.)

Foster arrived to work on July 13, 2011 around noon to work the second shift. (Foster Dep. at 75-76.) Between 8:00 and 9:00 p.m. she began reviewing the folder and noticed that some of the tasks on the checklist were not completed, while other tasks had the initials "NV" and July 13, 2011 as the date. (Id. at 76, 78-79, 98-99.) This indicated to her that someone had already started reviewing the folder earlier in the day but had not completed it. (Id.) Foster brought this to the attention of her supervisor, Burleigh, and asked permission to conduct a review on the file; Burleigh instructed her to complete the review. (Foster Dep. at 79, 116-17; Foster Decl. ¶ 6.)

As Foster began reviewing the folder, she noticed the nonconsecutive shipping and receiving dates on the SSI form. (Foster Dep. at 80, 82, 116; Foster Decl. ¶ 6.) Foster testified that the shipping date on the SSI form was June 5, 2011 (as opposed to June 2, 2011) and the receiving date was July 7, 2011. (Foster Dep. at 81, 92-93, 112, 116.) Foster noticed that the number 5 looked peculiar in how it had been written. (Id. at 81.) Foster knew that an ENC form was required, but because she had

13

only been working at BioLife for 4 months, she was not sure how to prepare one.  (Id. at 80, 82; Foster Decl. ¶ 6.)

Because her supervisor, Burleigh, was not available, Foster approached Marvin King (African American) for assistance.  (Foster Dep. at 64, 80-83, 116-17.)  She notified him that the shipping and receiving dates were not consecutive on the SSI form.  (Id.)  Foster asked King what she was supposed to do about the discrepancy. (Id. at 83.)  King said that he thought that an ENC should be initiated, but he wanted to confirm with Caldwell.  (Id. at 64, 83.)  Because Caldwell had left for the day, King called Caldwell and told her that there was a July 5, 2011 shipping date on the SSI form, but the receiving date was July 7, 2011.  (Id. at 83-84.)   Caldwell instructed King to initiate an ENC and then to put the folder containing the SSI form in her box so she could review it the following morning.  (Id.; Foster Decl. ¶ 6; King Decl. ¶ 5.)

Foster requested that King help her in preparing the ENC form since she didn't have experience with them.  (Foster Dep. at 83.)  Foster watched King initiate the ENC form and place it in Caldwell's box before they both left at the end of their shift. (Id. at 85.)  However, the next day, July 14, 2011, when King followed up with Caldwell regarding the SSI form and ENC form that he and Foster had initiated, Caldwell told him that the folder was not in her box when she arrived to work that

14

morning, but instead Vann had the folder.  (King Decl. ¶ 6.)

**D.  Investigation into the Falsified SSI Form**

When Stevick arrived to work on July 14, 2011, Vann and Caldwell approached him, and Vann stated that someone had falsified an SSI form.  (Stevick Dep. at 142, 238-40.)   Vann and Caldwell explained to Stevick that when they last saw the SSI form the afternoon  before, the shipping date on the SSI form had been July 2, 2011, but that as of that morning the date had been changed to July 5, 2011.  (Id. at 142, 238-39, 262, 268-69, 342-43.)    Stevick asked Vann how she knew the date had been July 2, and she told him she had identified the nonconformance on the SSI form on the previous shift and alerted Caldwell about it. (Id. at 142-43, 239, 286.)  Vann then recounted what had occurred the day before at Stevick's request.  (Id. at 112-13, 115-19, 135-37, 143, 239-40, 247, 262, 268-69, 342-43.)  Vann stated that she found the folder in Caldwell's bin that morning, and was checking on it to ensure an ENC form had been initiated.  (Id. at 144, 262, 268-69, 342-43.)

Stevick next spoke with Quality Assurance employee Aaron, who confirmed that the shipping date had been listed as July 2 when Vann asked her to review the SSI form.  (Id. at 143, 262, 268-69, 286, 342-43.) Stevick next spoke with Caldwell, who also confirmed that the shipping date had been listed as July 2 when Vann brought the SSI form to her attention the afternoon before.  (Id. at 118-20, 143, 240,

248, 262, 268-69, 286, 302-03, 312-14, 342-43.) Caldwell told Stevick that she had asked Montgomery to complete the reviews in the basket, and Montgomery had agreed to do so. (Id. at 118-20, 136-37, 240, 248, 262, 268-69, 302-03, 312-14, 342-43.) Caldwell further informed Stevick that King had called her the night before about the shipping date discrepancy. (Id. at 247.)

At this point, Stevick informed Waller, the PCR Pooling Laboratory Supervisor, that he believed someone had falsified a document and that he would be investigating the issue. (Id. at 241-42, 244.) Stevick told Waller all that he had learned from speaking with Vann, Aaron and Caldwell, and decided what their next steps would be in the investigation. (Id.)

In the meantime, Caldwell called the Fond Du Lac, Wisconsin collection center, where the samples originated, and discovered that the collection center had made an error on the SSI form. (Id. at 89-90, 239-40, 262, 268-69, 291, 342-43.) The center said that it had shipped the samples on July 6, 2011, and not July 2. (Id. at 89-90.) The center also told Caldwell that someone had called them the day before and that they had incorrectly told the employee who called that the shipping date was July 5, 2011. (Id. at 90-91, 181, 183-84, 262, 268-69, 291-92, 342-43.) The center could not recall whether the caller was male or female. (Id. at 183-84, 262, 268-69, 342-43.) Stevick tried to review the lab's telephone records to determine what time the call had

16

been placed to the Fond du Lac collection center, but the time could not be confirmed. (Id. at 181, 185, 262, 268-69, 342-43.)

After reviewing the records and talking with Burleigh, Stevick decided to interview Plaintiff. (Id. at 242-45.) Stevick and Burleigh interviewed Plaintiff on July 15, 2011. (Id. at 243-44, 286; Foster Dep. at 88, 91.) They explained that they were conducting an investigation regarding an ENC created on July 13, 2011 that related to an SSI form. (Foster Dep. at 93, 97-98.) Plaintiff remembered that folder, as she had noticed a discrepancy with her review. (Stevick De. at 245-46; Foster Dep. at 93, 95.) Burleigh asked Plaintiff if she recalled whether the shipping date was July 2nd or July 5th, and Plaintiff responded that the date was July 5th. (Foster Dep. at 95-96; Stevick Dep. at 245, 248.) Plaintiff then explained what happened during her review – that she had identified the discrepancy, informed King and asked for assistance. (Foster Dep. at 96.) Plaintiff explained that King had initiated the ENC, and she watched him place it in Caldwell's box. (Id. at 98.) Plaintiff did not have any knowledge regarding Montgomery's involvement with the SSI form. (Id. at 96, 98.) Burleigh asked Plaintiff if she knew if anyone had changed or tampered with the file's information and she replied that she did not. (Id. at 98.)

On Monday, July 18, 2011, Stevick, Waller and Senior Human Resources Representative Brian Hammond (Caucasian) met with Montgomery regarding the

17

potential falsification. (Stevick Dep. at 244.)  She explained that, although Caldwell had asked her to review the folder and initiate an ENC, so she took the folder out of the basket between 3:00 and 4:00 p.m., and that when she reviewed the folder, the shipping date was listed as July 2, 2011.  (Id. at 301-02.)   She ran out of time to complete the ENC, however, so she returned the folder to the basket at approximately 5:30 p.m. for another technician to complete.  (Id. at 268-69, 286, 312-13, 342-43.) Montgomery confirmed that she was in sole possession of the folder from the time she got it from the basket until she returned it and left work at 5:30 p.m. (Id. at 301-02.)  Montgomery stated that she did not call the Fond du Lac collection center to confirm the shipping date.  (Exh. 8 to Stevick Dep.)

Other employees on the night shift were also interviewed, including PCR Lab Technicians Tiffanie Jackson (African American), Joel Statum (Caucasian), Andrew Zhuralex (Caucasian) and Heather Turner (Caucasian).  (Id.)  None of these employees had any first-hand information regarding the event.  (Id.)  Additionally, Stevick reviewed employee time logs to determine when employees left work on July 13, 2011 and Facility Manager Ken Davis reviewed camera footage to determine if there was any information on them.  (Stevick Dep. at 136, 296.)  However, neither showed anything useful.  (Id.)

On July 18 or 19, 2011, Plaintiff again met with Stevick, Burleigh and

Hammond to further discuss the SSI form.  (Id.)  Hammond asked Plaintiff if she had any other information that could help with their investigation.  (Foster Dep. at 102.) Hammond specifically asked Plaintiff to give any information regarding whether King or Montgomery were involved in changing the shipping date on the SSI form. (Id. at 88-89; 102.)  Hammond also asked Plaintiff if she had spoken with the collection center and whether she was certain that she, King or Montgomery would not been identified by the collection center.  (Id. at 103.)  Plaintiff responded that she had not spoken with the center as it was already closed at the time the ENC was initiated by King.  (Id.)

Later that day, Burleigh spoke with Plaintiff individually.   (Id. at 104.) Burleigh asked Plaintiff if she felt intimidated by King or Montgomery, or if she felt a sense of loyalty to them because they had been working at Hoover longer than she had.  (Id.)  Burleigh further stated that he thought it was strange that King notified Caldwell, a lead technician, about the discrepancy rather than calling the center. (Id. at 105.)  Plaintiff replied that they had tried calling the center, but it had already closed.  (Id.)  Burleigh told Plaintiff that she could write down any names, she could do so discreetly and slide them under his door or place them on his desk.  (Id.)

On July 20 or 21, 2011, Stevick, Burleigh and Hammond interviewed King. King recounted that Plaintiff had asked him to help with the SSI form and that he had

called Caldwell about the form. (Stevick Dep. 262, 268-69, 342-43.)  King confirmed

that the shipping date was July 5, 2011 when he first reviewed the SSI form.  (Id. at

262, 268-69, 342-43.)  He further stated that he had placed the folder in Caldwell's

box before leaving at the end of his shift and that he had not called the Fond du Lac

collection center.  (Id. at 144, 262, 268-69, 342-43.)

Caldwell confirmed that King had called her on July 13, 2011 at 8:27 p.m.[11] to

inquire about how to handle an SSI form.  (Id. at 141, 262, 268-69, 303, 342-43; Exh.

8 to Stevick Dep.)   Caldwell also confirmed that King told her over the telephone

that the SSI form had a shipment date of July 5, 2011. (Stevick Dep. at 141, 303.)

In concluding the investigation, Stevick, Hammond and Burleigh interviewed

King, Montgomery and Plaintiff again, separately, to see if there was any additional

information they could provide that would assist Stevick in determining who falsified

the form.  (Id. at 252, 268-87.)  Plaintiff stated that she had told them everything she

knew about the incident and that she did not know anything regarding King or

Montgomery's involvement.  (Foster Dep. at 106.)  She further stated that she, King

and Montgomery were not the only ones who had access to the SSI form.[12]  (Id.)

---

[11]  Caldwell verified the time by reviewing her cellular telephone records.

[12]  For instance, Margaret McKenna (Caucasian) reviewed the SSI form during the
quality assurance review and did not note the nonconsecutive shipping and receiving dates.
(Stevick Dep. at 112.)  McKenna was not questioned during the investigation.  (Id. at 257-58.)

Hammond replied that she, King and Montgomery were the last known three individuals to have contact with the SSI form.  (Id. at 110.)

At the end of the final interviews, Hammond asked King, Montgomery and Plaintiff to write a statement regarding the SSI form.  Plaintiff testified that she included as much information as she could remember.  (Id. at 88-89, 107; Exh. 21 to Foster Dep.)  In her statement, Plaintiff provided some new information.  Specifically, she stated that she had seen a technician with the initials "MOS" write "5s" that were similar to the one on the falsified SSI form.  (Foster Dep. at 107-08; Exh. 21 to Foster Dep.)  Upon review of time cards for July 13, 2011, however, the "MOS" technician was not present during the time period when the SSI form was changed.  (Exh. 8 to Stevick Dep.)

**E.  Results and Aftermath of the Investigation**

Based on the investigation, Stevick determined that the date on the form was most likely changed sometime between 5:30 p.m. and 8:27 p.m., when King called Caldwell and stated that the shipment date was July 5th.  (Stevick Dep. at 141, 250-51, 302-10.)  The PCR employees known to have contact with the SSI form in question during that time frame were Montgomery, Plaintiff and King.  (Id. at 182, 250-51, 317-18.)  Because Stevick could not determine who changed the form, and

due to the seriousness of the infraction,[13] Stevick made the decision to terminate Plaintiff, Montgomery, and King based on his loss in confidence in their abilities and because he determined they were the most probable employees who falsified the form. (Id. at 250-52, 298-99, 300, 306-07, 317-18.)   All three employees are African American.

On July 26, 2011, Stevick, Burleigh, and Waller notified Plaintiff that the investigation into who changed the date on the form was inconclusive, but, because they concluded that the last three employees to have contact with the file were Plaintiff, King, and Montgomery, all three were being terminated.   (Foster Dep. at 113-15, 118, 121-22; Stevick Dep. at 228, 318.)   Stevick asked Plaintiff if there was anything else she would like to add, but Plaintiff did not provide any additional information.   (Foster Dep. at 116.)   Stevick told Plaintiff that she was being discharged for falsification of records as relating to the SSI form and because management had lost confidence in her abilities. (Foster Dep. at 120, 126; Stevick Dep. at 307.)  That same day, Stevick similarly informed Montgomery and King that they were being discharged because management had lost confidence in their abilities based on the falsification of the SSI form.  (Stevick Decl. ¶ 8.)

---

[13]   Changing "July 2" to "July 5" directly on the SSI form, rather than following the SOPs and initiating an ENC form, may have resulted in FDA fines, facility closure, or the potential release of unviable plasma samples to patients. (Stevick Dep. at 125-27, 182.)

The next day, July 27, 2011, Plaintiff filed her Charge of Discrimination with the EEOC. (Exh. 1 to Compl.)  Plaintiff alleged she was discriminated against in her termination because of her race.    BioLife was notified of Foster's Charge of Discrimination on August 2, 2011.  (Pl. Exh. 6.)  While her EEOC Charge was pending, on September 13, 2011, Stevick hired Chandesha Billings (African American) and Philissa Patterson (African American) to replace Plaintiff and King.[14] (Id. ¶ 9.)  Plaintiff's Notice of Right to Sue was mailed to her on  December 1, 2011, and Plaintiff filed the instant Complaint on February 29, 2012.  (Exh. 2 to Compl.; Compl.)

## IV. Applicable Substantive Law and Analysis

Plaintiff contends that she was terminated on the basis of her race, and she brings her claims of race discrimination under both Title VII and Section 1981. (Compl. ¶¶ 1, 30, 35.)  Claims of race discrimination under section 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore,

---

[14]  There is no evidence before the court as to whether Stevick had any knowledge of EEOC charge filed by Plaintiff.  Instead, the Notice of the Charge of Discrimination was addressed to Hammond, not Stevick.  Plaintiff's assertion that Stevick had knowledge of the charge is conclusory and without specific supporting facts.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Sammons v. Taylor, 967 F.2d 1533, 1544-45 & n. 5 (11th Cir. 1992). While all reasonable inferences should be made in favor of the nonmovant, any "inferences based upon speculation and conjecture [are] not reasonable." Blackston v. Shook and Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir.1985).

although the court explicitly addresses the Title VII claim, it is with the understanding that the analysis applies to the § 1981 claim as well.  Id.

## A.  Framework of Analysis

A plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.[15]  See Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).   Here, Plaintiff presents only circumstantial evidence of racial discrimination.   "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."  Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed;

---

[15]   See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[16]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one

---

[16]  See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[17]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) (pointing

---

[17] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## B.  Plaintiff's Termination Claim

The parties hotly contest whether Plaintiff established a prima facie case.  (See Doc. # 18 at 26-28; Doc. # 26 at 27-30; Doc. # 29 at 3-7.)  However, as the burden is admittedly a light one and can be established by many different methods, the court will assume without deciding that Plaintiff has established a prima facie case and get right to the heart of the matter.

BioLife articulated a legitimate, nondiscriminatory reason for terminating Plaintiff.  Stevick could not determine who had changed the date on the SSI form and after a thorough investigation he decided that Plaintiff, Montgomery and King were

27

the most likely individuals.   Therefore, Stevick terminated Plaintiff, as well as Montgomery and King, because they were the most likely employees who had falsified the form and he lost confidence in them.  (Foster Dep. at 120, 126; Stevick Dep. at 307.)  Because BioLife satisfied its burden of articulation, the presumption of discrimination falls and the burden of production now shifts to Plaintiff to offer evidence sufficient for a reasonable jury to conclude that the BioLife's supposedly legitimate reason is merely a pretext for illegal discrimination.  See Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000); see also Reeves, 530 U.S. at 147-48; Chapman, 229 F.3d at 1030.

As discussed above, pretext is established when a plaintiff "present[s] concrete evidence in the form of specific facts" showing that the defendant's proffered reason was pretextual.  Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009).  "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir.2005) (quotation marks omitted); see also Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir.2005) (A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's

28

proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.").  A plaintiff does not demonstrate pretext by showing that the defendant had a mistaken belief about the facts that formed the basis for the alleged nondiscriminatory reason.  Woodard v. Fanboy, L.L.C., 298 F.3d 1261, 1265 (11th Cir. 2002).  Instead, the plaintiff must present evidence that the defendant did not honestly believe the facts on which it based its nondiscriminatory reason.  Id. Further, when the employer provides a reason "that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." Chapman, 229 F.3d at 1030.  Conclusory allegations and assertions of discrimination are insufficient. See Bryant, 575 F.3d at 1308.

Plaintiff's  pretext arguments are centered on both theories of pretext - that the stated reasons are unworthy of belief and that race more than likely motivated the decision to terminate her.   More specifically, Plaintiff makes the following four arguments in support of pretext: (1) similarly situated Caucasian employees were treated more favorably than Plaintiff; (2) BioLife offered contradicting statements for terminating Plaintiff; (3) changing the SSI form did not violate BioLife's policy against fabrication; and (4) because Stevick could not conclude who actually falsified the form, no one should have been terminated.  (Doc. # 26 at 31-47.)  The first argument goes toward whether or not race more than likely motivated the decision to

29

terminate Plaintiff.  The rest of the arguments go toward whether the stated reasons

for her terminated are unworthy of belief.  The court addresses each argument below.

## 1.  Evidence that Race More than Likely Motivated the Termination Decision

Plaintiff contends that she was treated less favorably than similarly situated

employees outside her protected class.   As evidence of comparators, Plaintiff points

to the following Caucasian employees: (a) Nancy Vann, Donna Aaron and Margaret

McKenna; and (b) Christopher Pruitt.

Binding precedent from the Eleventh Circuit Court of Appeals requires

Plaintiff's comparators to be similarly situated in all relevant respects to those

comparators she identifies.  See, e.g., Morris v. Emory Clinic, Inc., 402 F.3d 1076,

1082 (11th Cir. 2005); Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th

Cir. 2001) (reversing judgment in favor of plaintiff because employer entitled to

judgment as a matter of law where plaintiff's comparator engaged in fewer instances

of misconduct than plaintiff); Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir.

1999) (affirming summary judgment in employer's favor where alleged misconduct

of comparators was not sufficiently similar to support disparate treatment claim);

Holifield v. Reno, 115 F.3d 1555, 1563 (11th Cir. 1997) (affirming summary

judgment where plaintiff failed to produce sufficient evidence that non-minority

employees with which he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged).  In evaluating the similarity of the comparators identified by the plaintiff, the most important variables in a discriminatory discipline case are the nature of the offenses committed and the nature of the punishments imposed. <u>See</u> <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1539 (11th Cir. 1989).  Both the "quantity and the quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples and oranges."  <u>Maniccia</u>, 171 F.3d at 1368.  In this analysis, a court must keep in mind that  "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]"  <u>Id.</u> at 1369.  Moreover, the actions of the employer toward the proffered comparators are only relevant if the decisionmaker knew of rule violations by the comparators and took no action against them.  <u>Jones</u>, 874 F.2d at 1542.

### a.  Vann, Aaron and McKenna are not proper comparators.

Plaintiff contends that Vann, Aaron and McKenna,[18] all Caucasian, engaged in the same or similar conduct as Foster, in that "they reviewed the SSI form from the

---

[18]   The court notes that Aaron and McKenna do not hold the same job as Plaintiff, PCR lab technician.  Instead, they work in quality assurance.  Nancy Vann does hold the same position as Plaintiff.

Fond du Lac" collection center and failed to generate an ENC form. Plaintiff argues that Stevick chose not to terminate the Caucasian employees and only terminated the African American employees who were involved with the particular SSI form. Because of this fact, Plaintiff concludes that she was discriminated against because of her race. The court disagrees.

Vann, Aaron and McKenna are not proper comparators. Based on a comprehensive investigation, Stevick reasonably believed that either Plaintiff, Montgomery and/or King were responsible for changing the date on the SSI form. Stevick did not believe that Vann or Aaron changed the date on the form because they both stated that the form was dated July 2 at all times it was in their possession. Their statements were independently confirmed by Lead Technician Erica Caldwell, an African American, who viewed the form after Vann and Aaron. Additionally, Stevick did not believe that McKenna changed the date on the form because no one ever indicated that she accessed or reviewed the folder in question on July 13, 2011. Instead, McKenna reviewed the folder seven days before when the samples were first received at the Hoover facility and Stevick thought that it was unlikely that she would remember a specific date on a form from a week previous. (Stevick Dep. at 57-58; 150-51, 186, 276, 315-17.) Simply put, Stevick did not believe that Vann, Aaron or McKenna were involved in changing the date on the form because they all

independently stated that the date on the form was July 2 when they were in possession of the folder in question, and the date did not change to July 5 until sometime after Montgomery received it.

Plaintiff is essentially asking the court to find an inference of discrimination based upon the mere fact that the employees on the day shift who had contact with form were Caucasian, while the employees on the night shift who had contact with the form were African American.[19]  The court refuses to do so.  Stevick had every right to interpret the information before him and make a determination as to whom he thought changed the date on the form.  See Maniccia, 171 F.3d at 1369.  He could not narrow it down to one individual, but reasonably concluded that the form was changed after Caldwell gave the form to Montgomery.  The court is not in the

---

[19]  As Defendant correctly notes, even this argument does not hold water:

> Caldwell, who is African American, was the last employee to have contact with the form before assigning it to Montgomery.  Stevick never suspected Caldwell of falsification because, like Vann and Aaron, but unlike Montgomery, Stevick could establish "book end" story confirmations for Caldwell, e.g. Vann and Aaron confirmed that the form was dated July 2nd before Caldwell received the form and Montgomery confirmed that the form remained dated July 2nd after Caldwell gave the form to her.  As a result, like Vann and Aaron, Caldwell was not terminated or otherwise disciplined.  Stevick's entirely consistent treatment of employees whom he did not suspect of falsification, regardless of their race, undercuts any suggestion of discrimination. . . .

(Doc. # 29 at 10.)

business of second-guessing the reasonable decisions of employers.  See <u>Baldwin v.</u>
<u>Blue Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1303-04 (11th Cir. 2007).

### b.  Pruitt is not a proper comparator.

Plaintiff also points to Christopher Pruitt, a Caucasian employee, who was disciplined for falsely documenting that he had done a review when in fact he had not.  (Doc. # 26 at 35-38.)  Pruitt, however, is not similarly situated to Plaintiff in all relevant respects.  Pruitt worked in a separate department and had a different job than Plaintiff.  His job duties were substantially different than Plaintiff's duties.  He reported to a different manager within a separate reporting structure, completely independent of Stevick.  (Stevick Dep. at 38, 46-48, 55-57; Hammond Decl. ¶ 4.) Such basic differences between Pruitt and Plaintiff is fatal to Plaintiff's contention that they are suitable comparators.  See <u>Simionescu v. Bd. of Trustees of the Univ.</u>
<u>of Ala.</u>, 483 F. Appx. 428, 431 (11th Cir. 2012) (plaintiff failed to establish comparator where, among other things, employee worked "in a different department from [plaintiff and] had a different supervisor"); <u>Mack v. ST Mobile Aerospace</u>
<u>Eng'g, Inc.</u>, 195 F. Appx. 829, 845 (11th Cir. 2006) (alleged comparator "was not similarly situated" because he had a different supervisor).

Moreover, the decisionmakers involved in the incident with Pruitt were different then the decisionmakers involved in the incident at issue here.  There is no

evidence before the court to indicate that Stevick had anything to do with the investigation regarding Pruitt's falsification.   Courts continually hold "that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII."   Jones, 874 F.2d at 1541; see also Tate v. Weyerhauser, 723 F.2d 598, 603 (8th Cir. 1983) (Where claimants charged with falsifying worksheets attempted to show pretext in reasons given for their respective discharges by comparing the treatment of several white employees who allegedly falsified documents, court found the misconduct and the respective disciplinary measures taken "distinguishable," because none of the supervisory personnel involved in the discipline of claimants participated in decisions regarding white employees); McCarver v. PPG Indus., Inc., 552 F. Supp. 2d 1294, 1299 (N.D. Ala. 2008) ("Comparator evidence fails where different decision makers are involved.").  This analysis is particularly apt here where an African American employee was also involved in the falsification with Pruitt and she was not terminated, but disciplined in a nearly identical fashion to Pruitt by their supervisor.  (Hammond Decl. ¶ 5.)

In sum, Plaintiff has failed to point to a comparator who is similarly situated in all relevant respects.  Therefore, her argument in this respect fails to establish that race more than likely motivated the termination decision.  The court turns to her remaining arguments.

35

**2. Whether the Stated Reason for Her Termination is Worthy of Belief**

Plaintiff argues that BioLife's stated reasons are unworthy of belief because it offered shifting or inconsistent reasons for her termination. (Doc. # 26 at 41-45.) She contends that Burleigh's testimony regarding the investigation and termination decision (specifically the time period within which the date was changed) is inconsistent with Stevick's testimony. (Id. at 41-42.) She also contends that BioLife contradicts itself in certain aspects of the investigation and conclusions drawn from that investigation. (Id. at 43-44.) Finally, she argues that because BioLife could not determine who actually falsified the form, it "did not base its decision to terminate Foster on a belief that Foster changed the shipping date." (Id. at 44-45.)

None of Plaintiff's arguments are persuasive. First and foremost, BioLife's reasons for terminating Plaintiff have remained consistent and have not changed. Specifically, Stevick terminated Plaintiff, Montgomery and King because he lost confidence in their abilities because they were the most likely employees who changed the date on the SSI form. Additionally, Burleigh's testimony cited by Plaintiff does nothing to support the "shifting reasons" argument. Burleigh was not involved in all aspects of the investigation by Stevick and he was not involved in the ultimate decision to terminate Plaintiff. (Burleigh Dep. at 74-75, 79-80, 83-85, 118-19.) Thus, Burleigh's testimony is irrelevant regarding the reason for Plaintiff's

36

termination.

Underlying all of Plaintiff's arguments is a second-guessing of the decision made by Stevick to terminate her based upon the information he had before him. Plaintiff continually denies that she falsified the form and states that there are questions of fact as to whether she violated BioLIfe's policy against falsification. (Doc. # 26 at 45-47.) She contends that because Stevick could never determine who actually falsified the form that no one should have been terminated. She points her finger to many other people who could have changed the form and to alleged deficiencies in the investigation, but all of these arguments are based on speculation without evidence to support them.

Most of her argument is made of self-serving assertions which do not aid in her burden of establishing that Stevick <u>believed</u> that she potentially falsified the form. To show that the proffered reason for her termination was pretextual, Plaintiff must show that Defendant based the decision to discipline her on an unreasonable belief that she behaved in the manner alleged.  <u>See, e.g.,</u>  <u>Silvera v. Orange County Sch. Bd.</u>, 244 F.3d 1253, 1261 (11th Cir. 2001), <u>cert. denied</u>, 534 U.S. 976 (2001) (pretext means more than a mistake by the employer; actions taken based on a mistaken, non-discriminatory belief do not violate Title VII); <u>Lee v. GTE Fla., Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000), <u>cert. denied</u>, 532 U.S. 958 (2001); <u>Equal Employment</u>

Opportunity Comm'n v. Total Sys. Servs., Inc., 221 F.3d 1171 (11th Cir. 2000) (plaintiff could be properly discharged on defendant's good faith belief that she lied in an internal investigation); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000), reh'g denied, 218 F.3d 749 (11th Cir. 2000) ("a plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991) (court's pretext inquiry is properly limited to whether the decision-makers believed the employee had engaged in conduct for which he was terminated and if so whether this belief was the reason for the discharge, not whether plaintiff was actually guilty of the conduct); Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1501 (11th Cir.1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge). Despite Plaintiff's conclusory assertion to the contrary, she has offered no evidence which contradicts the evidence before this court that Defendant terminated her because it believed that she had potentially falsified the form. See Thomas v. Miami Veterans Med. Cntr., 290 Fed. Appx. 317, 320 (11th Cir. Aug. 26, 2008) (conclusory allegations insufficient to support pretext); Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations, without more, are insufficient to show pretext).

In the absence of such evidence, Plaintiff's pretext argument fails. The record

shows that Defendant believed in good faith that Plaintiff had potentially falsified the SSI form, that Stevick lost confidence in her ability to do the job as a result, and accordingly terminated Plaintiff.  See Holifield, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.").  Whether Plaintiff actually falsified the form is not an issue for this court to referee.  See Wilson v. B/E Aerospace, 376 F.3d 1079, 1092 (11th Cir. 2004).  Holmes v. West Palm Beach Hous. Auth., 309 F.3d 752, 755 (11th Cir.2002) ("An employer articulates a legitimate nondiscriminatory reason for termination where the employer had an honest, good faith belief in the reason for termination, even if it turns out that the employer was mistaken in that belief."); E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("'Pretext is not demonstrated by showing simply that the employer was mistaken.'") (quoting Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir.1995)).  Abel v. Dubberly, 210 F.3d 1334, 1338-1339 (11th Cir. 2000) ("An employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation"); see also Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1256 (5th Cir. 1977) (Even if an employer wrongly believes that a plaintiff violated its policy, if the employer acted on its good faith belief it is not guilty of discrimination).  A discrimination plaintiff cannot establish pretext by simply asserting that his employer

was mistaken.  <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that courts do not second guess an employer's business judgment and that plaintiff cannot establish pretext merely by demonstrating that a reported work rule violation did not occur).  At best, that is all Plaintiff has done here, and it is insufficient to establish pretext.

In summary, Plaintiff has not created a genuine issue of material fact as to whether Defendant's articulated reason for her termination was pretextual.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1024-25.  Defendant's motion for summary judgment is, therefore, due to be granted for the reasons articulated above.

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that Defendant BioLife Plasma Services, LP is entitled to judgment as a matter of law as to all claims asserted by Plaintiff.  A separate order will be entered.

**DONE** this the   24th   day of July, 2013.

_____
SENIOR UNITED STATES DISTRICT JUDGE